UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA      )
                                       )
v.                                )      NO. 2:11-CR-33
                                       )
JAMES MARSHALL WOLFE        )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on defendant's "Motion For New Trial And/Or To Arrest Judgment" pursuant to Federal Rules of Criminal Procedure 33 and 34, [Doc. 42]. For the reasons which follow, the motion will be GRANTED IN PART and DENIED IN PART.

### I. Procedural Background

James Marshall Wolfe ("Wolfe" or "defendant") was indicted by the federal grand jury on April 12, 2012, [Doc. 1]. The five-count indictment charged Wolfe with possession with intent to distribute marijuana in violation of 21 U.S.C. § § 841(a)(1) and (b)(1)(D) (Count One); possession of a firearm (a Smith & Wesson 9 mm semi-automatic pistol) by an unlawful user of a controlled substance in violation of 18 U.S.C. § § 922(g)(3) and 924(a)(2) (Count Two); possession of a firearm (a Smith & Wesson .38 caliber revolver) in violation of 18 U.S.C. § § 922(g)(3) and 924(a)(2) (Count Three); possession of a firearm (AK-47 assault rifle) by an unlawful user of a controlled substance in violation of 18 U.S.C. § § 922(g)(3) and 924(a)(2) (Count Four); and possession of a firearm, namely a Smith & Wesson 9 mm semi-automatic pistol and a Smith & Wesson .38 caliber revolver, in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five). Wolfe appeared before Chief United States Magistrate Judge Dennis

H. Inman for his initial appearance and arraignment on May 2, 2011. Attorney David G. Mullins, who had been retained to represent the defendant, made his appearance for the defendant on that same date.

On May 23, 2011, defendant filed a motion to suppress all evidence seized during a search of 317 Wilson Avenue, Johnson City, Tennessee on March 31, 2011, [Doc. 8]. The government responded in opposition on June 1, 2011, [Doc. 9], and an evidentiary hearing was conducted by the Magistrate Judge on June 2, 2011. The Magistrate Judge filed a report and recommendation ("R&R") on June 14, 2011, recommending that the motion to suppress be denied, [Doc. 13]. The defendant filed an objection to the R&R, [Doc. 25], and the R&R was adopted and approved and the defendant's motion to suppress denied on June 24, 2011, [Doc. 28].

While the objection to the R&R was pending, the grand jury returned a five-count superceding indictment, [Doc. 15]. Counts one through four of the original indictment were unchanged; however, count five charged possession of a firearm, namely a Smith & Wesson 9 mm semi-automatic pistol, a Smith & Wesson .38 caliber revolver and an ***AK-47 assault rifle***, in furtherance of a drug trafficking offense. The change in count five was the only change from the original indictment. The defendant was arraigned on the superceding indictment on June 16, 2011. On the same day, the government filed an information "to place defense on notice of enhanced penalties," [Doc. 20], by reason of count five of the superceding indictment "due to defendant's use of a deadly weapon, namely an AK-47 assault rifle, in furtherance of drug trafficking." Specificially, the notice provided that the "enhancement set forth in 18 U.S.C. § § 924(c)(1)(A) and (B)(I)[sic]" increased the penalty to a ten year mandatory minimum to a maximum of life

imprisonment to run consecutively to the underlying drug offense.[1]

Trial of the case before a jury began on June 29, 2011 and concluded on July 1, 2011 with the jury returning a verdict of guilty as to all counts, [Doc. 32]. On July 15, 2011, the defendant filed, through newly retained counsel, a motion to enlarge his time within which to file a motion for new trial, [Doc. 37]. The motion was granted and defendant's time to file a motion for new trial was enlarged up to and including August 12, 2011, [Doc. 39]. The instant motion for new trial and/or to arrest judgment was then filed on August 12, 2011. An evidentiary hearing was held on September 15, 2011 and concluded on February 21, 2012.

## II. Analysis and Discussion

### A. Defendant's motion

Defendant's motion, made pursuant to Federal Rules of Criminal Procedure 33 and 34, alleges two general claims for relief: (1) The evidence in the case is insufficient to support the jury's verdict; and (2) defendant did not receive effective assistance of counsel and, had he received such effective assistance, he would have accepted a proposed plea agreement from the government and pled guilty to Counts One and Two pursuant to a plea agreement offered by the government. More specifically, defendant alleges that he receive ineffective assistance of counsel in the following particulars: (1) Counsel never advised him of the advisory Sentencing Guidelines range applying to his case and, indeed, failed to calculate the range; (2) counsel repeatedly advised him that he would prevail in the case based on the Sixth Circuit's holding in *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009); (3) counsel unreasonably advised him to turn down the plea offer, particularly when defendant was unaware that conviction as to Count Five would subject defendant

---

[1] The AK-47 increased the potential mandatory minimum from five years to ten years.

to a ten year mandatory minimum consecutive sentence; and (4) counsel had a conflict of interest (a) because of simultaneous representation of the owner of one of the firearms, the AK-47, found in defendant's residence, and (b) because counsel had engaged in criminal conduct himself and had a personal motivation to advise defendant not to enter into the plea agreement.

### B.     Applicable legal standard

The applicable legal standard is found in the text of Rules 33 and 34. Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The motion must be filed within 14 days of the verdict. Fed. R. Crim. P. 33(b). Claims of ineffective assistance of counsel, although ordinarily raised in a motion pursuant to 28 U.S.C. § 2255, may be raised in a motion for new trial. *See, e.g., United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (taking up the issue of ineffective assistance of counsel on direct appeal where the district court had denied the defendant's motion for a new trial after holding an evidentiary hearing); *United States v. Bost*, 144 F.Supp.2d 892, 901 (W.D. Mich. 2001) ("the permissible reasons for granting new trial . . . are not limited by the Rule and include ineffective assistance of counsel.").

"The defendant bears the burden of showing that a new trial ought to be granted." *United States v. Seago*, 930 F.2d 482, 488 ( 6th Cir. 1991). "The decision to grant or deny a motion for new trial rests within the district court's sound discretion" and will not be reversed "absent a clear abuse of discretion." *Id.*

Rule 34 allows the court to arrest judgment if "(1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a). A motion pursuant to Rule 34 must also be filed within 14 days of the verdict. Fed. R.

Crim. P. 34(b).

## C.     Motion for arrest of judgment

Defendant is confronted with two fatal deficiencies with respect to his Rule 34 motion.  First, the Rule requires that the motion be made "within 14 days after . . . a verdict."  Defendant's motion was clearly filed well beyond the applicable 14 day period and, although Rule 45(b) permits the court to extend the time for filing, the defendant did not make such a request in this case.[2]

Second, the Rule provides only two grounds for arresting judgment: (1) The indictment or information does not charge an offense, and (2) the court does not have jurisdiction of the charged offense.[3]  Defendant has neither raised nor argued either of these grounds in his written motion nor did he raise them orally and the record contains nothing which would support either ground.  The motion to arrest judgment lacks merit and will be denied.

## D.     Motion for new trial

### 1.     Sufficiency of the evidence

The defendant contends in his motion for new trial that the "evidence is insufficient to support the jury's verdict as to each count of conviction."  He does not further develop the claim in his memorandum in support of his motion and did not address it orally at the evidentiary hearing.[4]

In evaluating a Rule 33 motion based on the weight of the evidence, unlike a sufficiency claim under Rule 29, "the trial judge can consider the credibility of the witnesses and

---

[2]  Defendant did request an extension of time within which to file a motion for new trial.

[3]  These are the same two defenses that Rule 12(b)(3)(B) allows the court to consider "at any time while the case is pending."  Fed. R. Crim. P. 12(b)(3)(B).

[4]  The defendant did raise the same issue in a motion for judgment of acquittal both at the close of the government's proof and at the close of all proof.  The motions for judgment of acquittal were denied by the Court.

the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (quoting *United States v. Turner*, 490 F.Supp. 583 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir. 1980), *cert. denied*, 450 U.S. 912 (1981)). *See also United States v. Solorio*, 337 F.3d 580, 589 FN 6 (6th Cir. 2003).

In deciding this issue, the court must determine whether the jury's verdict is against the manifest weight of the evidence. The granting of a new trial is appropriate "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Ashworth*, 836 F.2d at 226; *United States v. Lutz*,154 F.3d 581, 584 (6th Cir. 1998). Whether to grant a Rule 33 motion is left to the sound discretion of the district court, *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008), and the defendant bears the burden of proving that a new trial is warranted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

In late March, 2011, Officer Brian Vicchio of the Johnson City Police Department, formerly a DEA Task Force agent, received information from an agent in Florida about a suspicious FedEx package being shipped from Eureka, California to the defendant's address in Johnson City, Tennessee. On March 31, 2011, officers intercepted the package, addressed to "James Ryan," and a drug dog alerted on the package. A search warrant was then obtained for the package. Inside the package was a large, locked pelican case, containing three large vacuum sealed packages of marijuana buds weighing approximately eight pounds.

Officers then made a controlled delivery of the package to defendant's residence at 317 Wilson Avenue, with Johnson City Police Department Investigator Stine posing as the FedEx

driver.[5]  Investigator Stine drove to the house, got the package out of the back of the van, and defendant immediately came out of the residence.[6]  When the defendant approached Stine with the package, the defendant said "cool."  Stine told the defendant he had a package for James Ryan and defendant replied: "I'm not James Ryan, but I'll sign for the package."  The defendant signed an illegible signature and took possession of the package.  The defendant was immediately arrested.

Officers then conducted a protective sweep of the residence, lasting only three or four minutes.  The officers noticed two firearms in the bedroom, one hanging from a doorknob in a shoulder holster and another on a night stand or small table.  After determining that no other individuals were inside the house, officers secured the residence until a search warrant could be obtained.  While the officers were waiting, a black male arrived at the house and said he was there to buy drugs.[7]

The small house consisted of a livingroom, kitchen, bedroom and a room where a pool table was set up.  When the officers searched the house, they found a number of items associated with drug use.  In the livingroom, officers found a book with the insides cut out which could be used to hide something and  by a chess set, there was a small bag of marijuana and several pills.  In the kitchen of the house, officers found an Ajax can, also with a hidden compartment, and two syringes.  Rolling papers and a pipe, commonly used to smoke marijuana, were also located.

---

[5]  Although posing as a FedEx driver, Investigator Stine was not wearing a FedEx uniform and was driving a white, unmarked minivan.

[6]  Wolfe had surveillance equipment mounted on the house.

[7]   The officers waiting at the residence were undercover officers and were not dressed as police officers.

Another pipe used to smoke marijuana was found in the room where the pool table was located. On top of the pool table was a pill bottle with seven pills inside.

In the bedroom of the house, in addition to the guns noticed during the protective sweep, the officers located a box of bullets, two magazines, and an AK-47 rifle in the corner of the bedroom, covered with a red towel or blanket. Officers also found a trauma plate for a military-like heavy bulletpoof vest. An additional bag of marijuana and digital scales were found in the drawers of a cabinet in the room containing the pool table. Inside a vehicle parked at 317 Wilson Avenue, the officers located two ammunition clips. Two cell phones were seized, one of which contained images including photographs of marijuana and oxycodone, bulk currency, and firearms similar to the ones found at the residence, a photo of a traffic ticket issued to the defendant at that residence, and text messages to the defendant by individuals requesting to purchase ounce and gram quantities of drugs.

At trial, the jury also heard testimony from Lisa Venable, manager of Wrap It Mail in Colonial Heights, who identified the defendant as the individual who brought a box into her store on March 28, 2011 around 5:45 or 6:00 p.m. to be shipped to Eureka, California. The defendant told Ms. Venable that the box contained dishes for a wedding gift, wanted it sent overnight, and paid almost $500.00 in cash. Ms. Venable became suspicious of the box, flagged it and the box was opened by a FedEx Hazardous Specialist. Inside the box was a pelican case with two locks, similar to the one recovered by police on March 31, 2011.

Given the overwhelming nature of the evidence against the defendant, it is easy to see why he did not attempt to develop his argument that the above cited evidence is insufficient to sustain his conviction as to any of the charges contained in the indictment. To sustain a conviction

for the offense of possession of a controlled substance with the intent to distribute that substance, the United States was required to prove that (1) the defendant knowingly, (2) possessed a controlled substance, (3) with the intent to distribute. *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006). To sustain the conviction for possession of a firearm by an unlawful user of a controlled substance, the government was required to prove that (1) the defendant was an unlawful user of a controlled substance; (2) the defendant possessed a firearm; and (3) the firearm had a connection to interstate commerce. *United States v. Drew*, 5 F.Supp.2d 16, 18 (D.D.C. 1998). A person is a lawful user of a controlled substance if "the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm." *United States v. Burchard*, 580 F.3d 341, 350 (6th Cir. 2009), (quoting *United States v. Purdy*, 264 F.3d 809, 812-13 (9th Cir. 2001)). To establish possession of a firearm in furtherance of a drug trafficking offense, the United States must prove (1) the defendant possessed a firearm, (2) the defendant committed a drug trafficking offense, and (3) there was a specific nexus between that possession and the relevant drug trafficking offense. *United States v. Grant*, 214 Fed. App'x 518, 520 (6th Cir. 2007).

Given that the defendant did not develop his argument that the evidence was insufficient to sustain any of his convictions, the Court will not discuss each of these elements in relation to the evidence at trial in any detail. It is, however, obvious that the evidence in the case was sufficient to sustain each and every one of the convictions in the case.

## 2. Ineffective assistance of counsel

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's performance was constitutionally deficient and that this deficiency prejudiced the

petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Meeks v. Bergen*, 749 F.2d 322, 327 (6th Cir. 1984). Judicial scrutiny of counsel's performance must be highly deferential. *Id*. The Court presumes from the outset that a lawyer is competent, and therefore, "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984). The first part of the analysis requires that a defendant show that the attorney's efforts fell below an "objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688.

### a. Potential or actual conflict of interest

Criminal defendants enjoy a Sixth Amendment right to conflict-free representation by their counsel. *See Smith v. Anderson*, 689 F.2d 59, 62-63 (6th Cir. 1982). In order to establish a violation of this right, a defendant must show: (1) that an actual conflict exists, and (2) that the actual conflict adversely affected his lawyer's performance. *United States v. Frederick*, 1985 WL 13474, at *5 (6th Cir. July 3, 1985) (citations and quotations omitted). The adverse effect, however, need not rise to the level of actual prejudice to the defendant. *See Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692, citing *Cuyler*, 446 U.S. at 345-50. "Prejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Id*. (quoting *Cuyler*, 446 U.S. at 350) (internal quotation marks omitted). It is not necessary for a defendant to show that "the conflict caused the defendant to lose his or her case." *McFarland v. Yukins*, 356 F.3d 688, 705 (6th Cir. 2004); all that is necessary is that an actual conflict of interest adversely affected the attorney's

performance. *Id.*

To establish an actual conflict, the defendant must point to specific instances in the record that suggest an actual conflict or impairment of his interests. *United States v. Mays*, 77 F.3d 906, 908 (6th Cir. 1996). The petitioner must show that the attorney made a choice between possible alternative courses of action and chose the one that benefited one client at the expense of the other. *United States v. Hall*, 200 F.3d 962, 966 (6th Cir. 2000). In order to show that counsel's performance was adversely affected by an actual conflict of interest, the petitioner must show that his attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Boykin v. Webb*, 541 F.3d 638, 644 (6th Cir. 2009) (quoting *McFarland*, 356 F.3d at 701).

In the Sixth Circuit, a defendant must show that trial counsel's choice "to forego a defense that would have been inconsistent with counsel's duty to another client is evidence of adverse effect only if it is clear that the choice was not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland* . . . ." Causation can be proved circumstantially. *MacFarland*, 356 F.3d at 706. "Thus, where counsel fails to pursue a strong and obvious defense, when pursuit of that defense would have inculcated counsel's other client, and where there is no countervailing benefit to the defendant from foregoing that defense or other explanation for counsel's conduct, these facts amount to evidence of disloyalty under any interpretation of *Sullivan*." *Boykin*, 541 F.2d at 644-45.

"[T]he possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350. If the conflict is as to a matter that is irrelevant or the conflict is merely hypothetical, there is no constitutional violation. *Kurby v. Dutton*, 831 F.2d 1280, 1282 (6th Cir.

1987).  If counsel did not make a choice helpful to one client but harmful to the other, the conflict is hypothetical.  *Hall*, 200 F.3d at 965-66.   If there is no showing of an actual conflict, the claim of ineffective assistance of counsel must rest on petitioner's making of the *Strickland* showing requiring both that counsel's performance was deficient and that the deficiency prejudiced the defendant.  *See Draper v. Adams*, 2000 WL 712376, at *7 (6th Cir. May 23, 2000).

Defendant argues that trial counsel here labored under a conflict of interest in two ways.  First, he claims that counsel had an "actual or potential" [8] conflict of interest because of counsel's representation of Aaron Storey, [9] the owner of the AK-47 assault rifle found at defendant's residence, on a state burglary charge.   Wolfe asserts that counsel could not call Aaron Storey "as a witness to claim ownership" or, presumably,  call defendant to testify as to ownership of the AK-47 because such testimony would benefit one client to the detriment of the other.

This claim is a non-starter, however, for very simple reasons.  First, defendant admits that he never told Mullins that Storey was the owner [10] of the AK-47.  Second, the defendant was convicted of ***possession*** of the AK-47 in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c).  Thus, the government was only required to prove defendant's possession of the firearm, not his ownership of the firearm.  Because "ownership and possession are not identical concepts," *Smith v. United States*, 285 Fed. App'x 209, 2008 WL 2622657 (6th Cir. (Mich.))

---

[8]  Although defendant makes a claim of "actual or potential" conflict of interest in his motion, he clearly asserts in his memorandum, as he did at the evidentiary hearing, that the conflict alleged "is an actual conflict."

[9]  The defendant and counsel, Mr. Mullins, are fraternity brothers and Aaron Storey is a fraternity brother of both Mullins and Wolfe.

[10]   Mullins confirmed this and testified that he did not question defendant about ownership of the AK-47 because it was not relevant.

(quoting *United States v. Ballentine*, 1999 WL 1073653, at *7 (6th Cir. 1999)), Storey's ownership, as well as his possible guilt or innocence of any offense involving the ownership of the AK-47, was irrelevant to Wolfe's own guilt. *See Ballentine*, 1999 WL 1073653, at *7.(" [another's] guilt neither logically entails nor even probalistically indicates [defendant's] innocence" of possession of firearms). Defendant cannot show, therefore, that evidence of Storey's ownership of the firearm would have beneficial to him or even admissible, given its irrelevance.

Finally, the defendant can show no reason why evidence of Storey's ownership of the firearm would have in any way have been detrimental to Storey. No claim is made that ownership or previous possession of the AK-47 by Storey was in any way illegal. At best, the defendant has shown only that Storey had been charged with a state burglary offense, not that his ownership or possession of the AK-47 was prohibited by any state or federal statute.

The defendant's second claim of a conflict of interest arises, not because of counsel's representation of another client, but because of counsel's own alleged criminal conduct. The factual premise for this claim is somewhat hazy but, from what the Court can tell, Wolfe claims that, during a meeting with Mullins in Pigeon Forge, Tennessee, shortly after Wolfe was charged in state court, Mullins asked Wolfe to go to Johnson City to "pick something up for him" in exchange for a $1,000.00 reduction in his legal fee. Wolfe did not testify that he actually made the trip. When Mullins was asked at the evidentiary hearing whether he had discussed with defendant "going to Johnson City to get Roxycodone," he initially claimed lack of recall but, when pressed, asserted his Fifth Amendment right and refused to answer questions about such discussion, his personal use of

Roxycodone, and an e-mail related to the $1,000.00 reduction in fee. [11]

Defendant does not develop this argument in his motion or brief, simply alleging in his motion that "counsel had an actual or potential conflict of interest when offering Mr. Wolfe advice on whether to accept or reject the proposed cooperation plea agreement tendered by the United States." At the evidentiary hearing, defendant's current counsel argued that trial counsel could not properly advise the defendant to enter into a cooperation plea agreement which would, in fact, require the defendant to give the government incriminating information related to counsel's own criminal conduct. [12] Defendant's expert witness also testified at the evidentiary hearing that a clear conflict of interest would exist if the attorney had potential criminal exposure himself from conduct with the defendant.

Although this is a very disturbing allegation, petitioner has not carried his burden of proving an actual conflict exists, simply because he has not shown, even by a preponderance of the evidence, that Mullins was involved in illegal, criminal conduct. The conflict, if it existed at all, is simply a hypothetical conflict and it has not been established by a preponderance of the evidence that Mullins was in fact engaged in criminal activity related to the use, possession or distribution of Oxycodone. Petitioner's claim of an actual conflict of interest fails.

### III.Advice Related To The Plea Agreement

It is undisputed that the government extended a proposed plea agreement to the defendant

---

[11] A transcript of a host of text messages sent by Mullins to witness was admitted at the evidentiary hearing. An April 26, 2011 text message from Mullins does confirm that Mullins had "agreed to lower the fee by 1 thousand in consideration for [Wolfe] fulfilling an obligation."

[12] The cooperation agreement required "[t]he defendant . . . not to protect anyone who was not truly involved and not to falsely implicate anyone who was not truly involved in the commission of criminal offenses." The agreement to cooperate does not appear to have been limited to the offenses of conviction or related offenses.

which required him to plead guilty to Count One (possession with the intent to distribute marijuana) and Count Two (possession of a firearm by an unlawful user of a controlled substance) of the indictment and in which the government agreed to dismiss the remaining counts. [Doc. 45, Ex. 1].[13] It is unclear from the record exactly when the offer was made by the government but it appears to have been sometime before the return of the superseding indictment by the grand jury and its terms are not disputed. The defendant argues that Mullins unreasonably advised him to reject the offer, which he would have accepted if the benefits of the plea agreement had been properly explained to him, if he had been correctly advised of his potential sentencing exposure, and if counsel had not given him false hope regarding the likelihood of the success of his motion to suppress.

### 1. The Sentencing Guidelines

The defendant alleges that he was never told by Mullins how federal sentences are determined and was never advised of the Sentencing Guidelines range which would apply to his case. The defendant claims to have learned of the Sentencing Guidelines from other inmates while held in pretrial custody and that he then specifically asked Mullins about his Guidelines exposure. According to Wolfe, Mullins told him the Sentencing Guidelines were "inconsequential" because of the mandatory minimum and "don't apply to [him]", never went over the guidelines with him, and told him that he would get the same sentence after a conviction at trial that he would get under the plea agreement. Although Mullins did tell him that Count Five carried a mandatory minimum,[14] defendant testified that Mullins never told him about the potential difference in penalties if he

---

[13] The written plea agreement was provided by Mullins to the defendant's mother on the day of the jury's verdict according to the uncontradicted testimony at the evidentiary hearing. Mullins testified at the evidentiary hearing that he did not retain a copy of the proposed plea agreement.

[14] The defendant was advised by the Magistrate Judge of the consecutive mandatory minimum of five years as to Count Five at the time of his arraignment.

accepted the plea agreement.[15]  Wolfe's mother, Cynthia Withers ("Withers") also testified that she had asked Mullins about the Guidelines and was told that the "Guidelines do not apply to Marshall." According to Withers, Mullins also told her, in response to her question about how much time Wolfe would have to serve with a guilty plea, that he thought "15 years was the best [Wolfe] was going to do."

Mullins also testified at the evidentiary hearing.  Mullins testified that he reviewed the indictment with Wolfe and explained the potential penalties and possible defenses.  Mullins testified that, just prior to the government seeking the superseding indictment, the AUSA handling the case made an oral offer[16] of a plea agreement with the firearm in furtherance count to be dismissed and no cooperation required of Wolfe.   Because he understood that the offer would be off the table if the superseding indictment was returned, Mullins claimed to have traveled to the Greene County Detention Center where Wolfe was being held at 5:00 a.m. in the morning where he fully explained the offer and told Wolfe there was still a "substantial likelihood" of jail time with the agreement. According to Mullins, he told the defendant the offer was a "good offer" and that he should accept it, but that the defendant rejected the proposed agreement.

Mullins also testified that he reviewed the Sentencing Guidelines with the defendant and advised him of his estimate of the guidelines range but that his Guidelines Manual was confiscated

---

[15]   As noted above, the plea agreement would have resulted in a dismissal of Count Five.

[16]   Mullins testified that he did not have a copy of the written plea agreement.  When shown the written plea agreement, [Doc. 45-1], Mullins identified it as a prior agreement offered by the government which he claimed was reviewed and rejected by the defendant.  He said the second, oral agreement was the same except "there was no requirement to cooperate and it knocked off the 924(c) charge (Count Five)."

by the deputies at the detention center.[17]   Mullins testified that Wolfe is "intelligent but not reasonable" and that he warned him that he would be convicted if the motion to suppress was not granted and would get jail time because of the mandatory minimum.  On cross-examination, Mullins expressed the opinion that the Guidelines are immaterial if there is a mandatory minimum.  Although Mullins maintained that he did go over the Guidelines with Wolfe, he could not recall how the range was calculated or what the range was.[18]   Mullins said he advised defendant not to accept the first, written plea agreement offered but did advise him to accept the second because the government was about to raise the stakes by charging possession of a machinegun in furtherance of a drug trafficking crime.  Mullins testified that he thought an AK-47 was a machinegun.[19]

"[I]t is well settled that a defense attorney's inaccurate calculation and prediction of the sentencing guidelines is not a basis for setting aside a guilty plea."  *United States v. Hicks*, 4 F.3d 1358, 1363 FN.3 (6th Cir. 1993) (citing *United States v. Stephens*, 906 F.2d 251, 254 (6th Cir. 1990)).  This is so because the defendant suffers no prejudice when, after a properly conducted plea colloquy with the district court where he is advised of the maximum sentence that can be imposed, the defendant pleads guilty with the knowledge that his attorney's advice may be inaccurate.  The

---

[17]   On cross-examination, Mullins explained that he intended to provide the manual to Wolfe but jail personnel wouldn't let Wolfe keep it.

[18]   Mullins later invoked his Fifth Amendment right when asked questions about Wolfe's allegation that Mullins tried to enlist him in criminal conduct by picking up Oxycodone for him.  He then refused to answer further questions about the guidelines range calculation or the Sentencing Guidelines in general.

[19]   Conviction of possession of a machinegun in furtherance of a drug trafficking offense would result in a 30 year mandatory minimum sentence.  18 U.S.C. § 924(c)(1)(B)(ii).  Possession of the AK-47 under the same circumstances, on the other hand, would result in a 10 year mandatory minimum.  18 U.S.C. § 924(c)(1)(B)(i).  In this case, however, the government did not seek to prove the possession of the AK-47 as an element of the offense at trial and conviction as to Count Five would result in the same mandatory minimum five years with or without the AK-47.  *See United States v. O'Brien*, 130 S. Ct. 2169 (2010).

situation is different, however, when the attorney give erroneous or inadequate advice to a client who then rejects a plea agreement in reliance on the advice, takes the case to trial, and then faces a much greater sentence than he would have gotten had he pleaded guilty.

During the plea stage of the proceedings, the defendant has the right to rely on counsel as a "medium" between him and the government. *See Maine v. Moulton*, 474 U.S. 159, 171 (1985). Where a defendant alleges that counsel failed to provide appropriate professional guidance regarding his sentencing exposure during plea negotiations, a modified *Strickland* standard applies requiring the defendant to prove (1) that counsel's performance was objectively deficient; and (2) that but for the erroneous advise, there is a reasonable probability that he would have accepted the plea. *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001). It is true, as the government argues, that "[t]he decision to plead guilty–first, last, and always–rests with the defendant, not his lawyer," *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003); however,

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available. In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time.

*Id.* at 553 (citing *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992) (observing that "the Sentencing Guidelines have become a critical, and in many cases, dominate facet of federal criminal proceedings" such that "familiarity with the structure and basic content of the Guidelines . . . has become a necessity for counsel who seeks to give effective representation," and holding that incorrect advice about sentence exposure undermined defendant's ability to make an intelligent

decision about whether to accept a plea offer.)); *see also Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003).

The Supreme Court has recently affirmed that the right to "effective assistance of competent counsel" extends to the plea bargaining process. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012). The Court also reaffirmed that the *Strickland* analysis applies to ineffective assistance of counsel claims arising out of the plea bargaining process. *Id.* The Sixth Amendment does not require an attorney to make a completely accurate assessment of the risks of accepting an offered plea agreement versus going to trial, but the Supreme Court has "recognize[d] that counsel must at least be aware of such risks" where counsel's knowledge or awareness directly impacts his advice. *Miller v. Staub*, 299 F.3d 570, 584 (6th Cir. 2002) (Gilman, J. concurring)(citing *McMann v. Richardson*, 597 U.S. 759, 770 (1970).

Here, as noted above, the testimony of counsel conflicts dramatically with that of defendant and his mother. Although defendant and his mother have clear reasons for slanting their testimony here, and their testimony is suspect for that reason alone, the Court finds the testimony of defendant and his mother far more credible than that of Mullins.[20] Mullins's bearing and demeanor while testifying at the evidentiary hearing suggested to the Court that his testimony was self serving[21] and not credible. Furthermore, Mullins's entire testimony revealed a serious lack of understanding of the structure of the United States Sentencing Guidelines or the way ranges are

---

[20] The Court is very much aware of the potential for a defendant to "game" the system by going to trial and subsequently seeking to avoid the sentence to obtain the benefit of a more favorable plea agreement. As a result, relief in such a case should be very rare. That does not mean, however, that relief should never be granted.

[21] At the time of the evidentiary hearing, Mullins's law license in both Virginia and Tennessee had been suspended because he failed to respond to a claim of misconduct.

calculated under the Guidelines. For instance, Mullins testified that the Guidelines are irrelevant if there is a mandatory minimum sentence which applies to the case. While this may be true for a charge where the guidelines range is below the required statutory minimum sentence, it is not true where, as here, one count of the indictment carries a mandatory minimum sentence which must be served consecutively to the sentence for another count where the law does not require a mandatory minimum. Mullins testified that his belief that the Guidelines are immaterial if there is a mandatory minimum was based on the fact that "if you are convicted on the mandatory minimum, you are going to jail." [22] Mullins was unable, at the evidentiary hearing, to recall how the guidelines range for Wolfe's case was calculated or what the range in fact was.

Mullins's understanding of the statutory scheme appears to be just as deficient as his understanding of the Sentencing Guidelines. He did not know what the statutory ranges were for Wolfe's crimes and indeed said it was the threat of the superseding indictment to add the possession of an AK-47 that caused him to finally advise Wolfe to accept the plea agreement. He testified that he believed an AK-47 fit the definition of a machinegun under federal law. Thus, it appears that Mullins, who had never tried a federal criminal case before, lacked even a basic and rudimentary understanding of the Guidelines or statutory scheme necessary to provide proper advice to Wolfe. Mullins's representation of Wolfe in this respect was constitutionally deficient.

The prejudice alleged by Wolfe here is that he would have accepted the government's plea offer if it had been properly explained to him and if he had been accurately advised of the benefits of the plea. The prejudice component of the ineffective assistance of counsel claim will be discussed

---

[22] The Court does not have a transcript of the evidentiary hearing and the quote is a paraphrase based on the Court's notes.

below.

### 2. *United States v. Archibald*

As noted above, officers conducted a protective sweep of Wolfe's residence just after he was arrested in the front yard after signing for the package containing marijuana. Officers then sought and obtained a search warrant for the premises, based in part on what they observed during the protective sweep. Mullins filed a pretrial motion to suppress the evidence recovered during the search, [Doc. 8], without any accompanying memorandum. The government responded to the motion, [Doc. 9], and the Magistrate Judge conducted an evidentiary hearing. The Magistrate Judge filed a report and recommendation ("R&R") recommending that the motion be denied. Defendant objected to the R&R on numerous grounds, including that the protective sweep was unlawful. The objection cited no case law and was overruled by this Court and the motion to suppress was denied.

Wolfe claims that Mullins "repeatedly insisted" that Wolfe would "prevail in Cincinnati" on the suppression motion on the basis of *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009). On this basis, defendant claims that Mullins advised him to reject the offered plea agreement and go to trial, advice which defendant characterizes as "constitutionally infirm." Wolfe testified that Mullins never explained to him that the remedy, even if the protective sweep was deemed illegal, was to excise all references to the protective sweep from the warrant affidavit and that the Court would then determine whether the remaining contents of the affidavit established probable cause for the warrant to issue.

In *United States v. Archibald*, the defendant's arrest was completed outside the residence where he was handcuffed and patted down. Officers then conducted a protective sweep of the residence and found incriminating evidence which was then used to obtain a search warrant. *Id.* at

21

292-93.  The Sixth Circuit held that the protective sweep was not justified under the Fourth Amendment because the government could not meet its burden of demonstrating articulable facts that, taken together with rational inferences from those facts, would have warranted a reasonably prudent officer in believing that the area to be swept harbored an individual posing a danger to the officers.  *Id.* at 301.  Mullins did not cite the *Archibald* case in the motion to suppress nor in his objection to the Magistrate Judge's R&R.

Although Mullins asserted at the evidentiary hearing that he advised Wolfe to accept the plea agreement and never guaranteed a good result on appeal, he acknowledged that he thought the law was clear cut and that the motion to suppress had merit.  Indeed, Mullins thought suppression was the only defense in the case and defendant would almost certainly be convicted if the motion to suppress was not granted.  Mullins claimed that he told the defendant that the motion to suppress, the thrust of which was aimed at the protective sweep, was the "way to get to Cincinnati," not that he would win on the issue, however.  He further stated that he still felt very strongly, even at the time of the evidentiary hearing, that the protective sweep was illegal and the search warrant invalid.

Wade Davies, a broadly experienced criminal defense lawyer from Knoxville, was called by defendant as an expert witness on the *Strickland* standard at the evidentiary hearing.  Davies testified that he had reviewed the case file and the Sixth Circuit *Archibald* opinion.  In Davies's opinion, it was highly unlikely that *Archibald* would have given Wolfe a "free pass" in view of the significant difference between the cases[23]  and the limited effect of a holding that the sweep was in violation

---

[23]  In *Archibald*, officers had no reason to believe that any other person might be in the residence.  In contrast, the officers here were delivering a package addressed to a person named James Ryan and Wolfe had just disavowed that identity.  These officers were clearly justified in conducting a protective sweep of the house in view of the fact that they had just delivered a package containing a significant amount of marijuana to James Ryan who might well be inside the residence and pose a threat to the officers.

of the Fourth Amendment.  Davies noted that the remedy for such a violation would be excision of the information related to the sweep from the affidavit.  Davies opined that such an excision in the case would have no effect because the affidavit, even after the excision, established ample probable cause for the issuance of the warrant.[24]  Davies thought it clear that advice by Mullins to Wolfe to reject the plea agreement in the case under these circumstances was deficient and constituted ineffective assistance of counsel.

Davies also testified that Wolfe should have been fully advised of the risk of taking the case to trial and that advice to Wolfe by Mullins to reject a plea agreement with the threat of a conviction under 18 U.S.C. § 924(c) looming was unreasonable.  Davies characterized the decision on the plea agreement to be a "no brainer."

With this issue, as with the prior one, the Court is called upon to resolve a conflict in the testimony.  Once again the testimony of defendant and Mullins is completely contradictory.  On the one hand, Wolfe claims that Mullins never explained the specific terms of the plea agreement, never showed him a copy of the plea agreement, and never advised him of the risk of rejecting the plea agreement and going to trial.  Mullins's testimony is just the opposite.[25]

---

[24]  It appears that the excision would have required only one sentence to be removed from the affidavit.  That sentence referenced the discovery of "a handgun lying on the dresser in a bedroom" during the protective sweep.

[25]  Mullins acknowledged that he did not show Wolfe a copy of the plea agreement when he appeared at the detention center to discuss the offer with Wolfe early in the morning of the day the grand jury met to return its superseding indictment.  Mullins contends the offer was oral and that he had not been provided a written copy of the proposed plea agreement.  He identified the plea agreement introduced at the hearing, [Doc. 45-1], as a "first" offer.  He stated that the "second" oral offer differed from the first written offer in that it dropped the 924(c) count and dropped the cooperation requirement.  Once again, Mullins's testimony makes no sense.  Even a cursory review of the written plea agreement [Doc. 45-1] shows that the government agreed in that agreement to dismiss all counts other than one and two, including the 924(c) count, although the agreement did in fact have a cooperation provision, something it was important to the government in an effort to find out who the California supplier of marijuana to Wolfe was.  The only thing in this record which suggests that there was a second oral plea offer is Mullins's testimony.  The Court, therefore, finds that there

On this issue, too, the Court finds the testimony of Wolfe more credible than that of Mullins. Mullins's demeanor, his invocation of his Fifth Amendment rights not to answer questions, and the other testimony convinced the Court that Mullins did fail to properly explain the terms of the proposed plea agreement, that he did not fully explain the risks of accepting the agreement versus going to trial, and that his advice to Wolfe to reject the plea agreement and rely on winning in the Sixth Circuit was grossly deficient. Wolfe's testimony on these matters is greatly bolstered by the fact that Mullins provided a link to the *Archibald* case to defendant's mother and was adamant with her that the protective sweep was bad and therefore the search warrant itself was bad. According to Withers, Mullins was always adamant that the evidence would be thrown out and both the state and federal prosecutions dismissed. Mullins continued at the evidentiary hearing to insist that the *Archibald* strategy was a good strategy and that he felt very strongly that the issue was a likely winner. Thus, the Court concludes that Mullins's representation of Wolfe was constitutionally deficient, indeed, grossly erroneous, in this respect also and meets the first prong of the *Strickland* test.[26]

### 3.    Prejudice

Having determined that Mullins provided ineffective assistance of counsel to Wolfe in his representation of Wolfe during plea negotiations, the Court must now determine if the second prong of the *Strickland* test has been met, i.e., whether Wolfe can show prejudice. The Supreme Court recently set out clearly what must be shown to meet the prejudice prong of the *Strickland* test in the

---

was only one plea offer extended in the case and the terms of that agreement are reflected in document 45-1.

[26]    Although not a significant factor in the Court's determination, the Court also notes that the case agent, Officer Chris Stein, also testified at the evidentiary hearing of his concern and that of the AUSA assigned to the case about the quality of the representation provided to Wolfe by Mullins.

context of a rejected plea offer:

> In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed.

*Lafler*, 132 S.Ct. at 1385. The Supreme Court has previously defined the term "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The burden of establishing a reasonable probability is relatively low, being less than a preponderance of the evidence. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (noting that a state-court decision applying a preponderance of the evidence standard to a question of attorney competence would be contrary to *Strickland*'s holding "that the prisoner need only demonstrate a 'reasonable probability'" of a different outcome); *see also Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009) (explaining that a reasonable probability is "less than a preponderance of the evidence").

In *Lafler*, the Supreme Court made it clear that "prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Lafler*, 132 S.Ct. at 1387. Even prior to *Lafler*, the Sixth Circuit had recognized that a substantial disparity between the plea offer and the post-trial sentence provides evidence that the defendant would have accepted the plea. *See, e.g., Smith*, 348 F.3d at 552; *Margana*, 263 F.3d at 551-52. And, in the Sixth Circuit, it is not required that "a defendant must support his own assertion that he would have accepted the offer with additional objective evidence." *Smith*, 348 F.3d at 551.

Wolfe has provided an affidavit and he testified at the evidentiary hearing that, if he had been properly advised, and been aware of the huge disparity in sentencing that existed between what the plea agreement offered versus what he faced after trial, he would never have taken the case to trial but would have pled guilty. He further asserts that he is prepared to accept the plea offer and plead guilty as provided in the plea offer. Although Wolfe is not required to show any further objective evidence to support his own assertion, there is other such evidence in the record. First of all, the government's evidence against Wolfe was simply overwhelming and he had no reasonable expectation of an acquittal at trial on any of the charges. Even Mullins concurs in that conclusion. So the simple fact of taking the case to trial subjected Wolfe to convictions which exposed him to the possibility of life imprisonment.

His statements are also bolstered by the fact that there is such a wide disparity between the maximum sentence faced by him under the plea agreement, i.e. fifteen years, and what he now faces, i.e. life imprisonment. In addition, he has now been convicted of much more serious charges which subject him to a mandatory minimum consecutive term of imprisonment. While it is true, as the government argues, that Wolfe cannot show a huge disparity between the sentence he was likely to receive under the plea agreement and the sentence he will receive as a result of the jury verdict because of the Court's considerable discretion in imposing a sentence consistent with the § 3553(a) factors, the simple fact remains that the Court could impose a life term of imprisonment based upon the jury's verdict and could have imposed no more than 15 years under the plea agreement. These factors demonstrate that Wolfe has established the second element of the *Strickland* test, that is, "a reasonable probability that the plea offer would have been presented to the court, i.e. that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light

of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe" than the punishment ultimately faced. *Lafler*, 132 S.Ct. at 1385; *see also Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012).

**4.      The Remedy**

At the conclusion of the evidentiary hearing, both the government and the defendant asked the Court for additional time to address the appropriate remedy in the case, if necessary. The evidentiary hearing was concluded, however, before the Supreme Court's decisions in *Lafler v. Cooper* and *Missouri v. Frye*. Those decisions make the remedy reasonably clear and further briefing by the parties is not necessary.

In *Lafler*, the Supreme Court noted that "Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." 132 S.Ct. at 1388 (internal quotation marks omitted). In the typical case, where the only injury suffered by a defendant is a higher sentence, "the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between." *Id.* at 1389.

That approach, however, will not work here. As noted above, the plea agreement's terms were considerably more favorable to Wolfe and he has now been convicted of additional and more serious charges by the jury. In addition, as the government argues, it has now potentially lost a major benefit of the bargain it sought with the defendant, that is, his cooperation in an effort to identify and prosecute the California marijuana supplier. As a result, sentencing based on the jury's verdict under terms of the plea agreement is not possible and will not restore the defendant and the

prosecution to the positions they occupied prior to the rejection of the plea offer. *Id*. at 1319. In that case, "the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal." [27] Wolfe has indicated that he is prepared to accept the offer reflected in document 45-1 and, if that happens, the Court will then have the discretion to fashion a sentence which would not unnecessarily infringe on competing interests but which would refer to the plea agreement as a "baseline [that] can be consulted" in fashioning the appropriate remedy. *Id.*

Because the Court has decided that Wolfe's Sixth Amendment right to counsel was violated during the plea bargain process and because the initial plea offer was to fewer charges and less serious charges than those for which the jury convicted him, the Court will order that the government reoffer to Wolfe the original plea agreement, [Doc. 45-1], within fourteen (14) days of the date of this order. "Presuming [Wolfe] accepts the offer [as he has indicated he intends to do], the . . . Court can then exercise its discretion in determining whether to vacate the convictions and [ ]sentence respondent pursuant to the plea agreement, to vacate only some of the convictions and [ ]sentence respondent accordingly," or fashion some other remedy.

So ordered.

ENTER:


s/J. RONNIE GREER<br>
UNITED STATES DISTRICT JUDGE

---

[27]     Although the government argued in its response to defendant's motion that requiring the government to reoffer a plea agreement after the defendant had received a fair trial raises separation of powers issues and violates "basic fairness principles," the Supreme Court in *Lafler* and *Frye* have essentially rejected those arguments. The government does acknowledge, however, that a new trial would be even more onerous to the interests of the United States.